**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**CASE NO.**

J.P.'S INN, INC.
and JOHN PIRRAGLIA

            Plaintiffs,

    v.

CFG MERCHANT SOLUTIONS, LLC, and
JOHN and JANE DOE DEFENDANTS,

            Defendants.

## COMPLAINT

Plaintiffs, J.P.'S INN, INC. and JOHN PIRRAGLIA (collectively, Plaintiffs) sue Defendants, CFG MERCHANT SOLUTIONS, LLC ("CFG" or "the MCA-Funder Defendant") as well as the JOHN and JANE DOE DEFENDANTS (the "John/Jane Doe Defendants") and, in support hereof, states as follows:

### SUMMARY OF THE CLAIMS

1. This lawsuit is brought by J.P.'S INN, INC. ("JP's Inn") and its principal, JOHN PIRRAGLIA ("Mr. Pirraglia) against CFG MERCHANT SOLUTIONS, LLC.

2. CFG is a business funder who preys upon its victims by offering them funding in the form of so-called a "merchant cash advance" or "MCA". MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a portion of a business's future account receivables.

3. These merchant cash advances are in fact unlawful, usurious loans with interest

rates that hover around 90% per annum, far above the maximum rate permissible for a loan under New York law.  CFG deducts daily amounts directly from JP's Inn's bank account(s) regardless of the amount of receipts that JP's Inn earned that day.

4.      To evade applicable usury statutes, CFG's loans were disguised as a purchase and sale of future receivables agreement, but its terms, conditions and CFG's actions demonstrate that, despite the agreement's form, no sale of receivables took place.  Rather, each agreement was intended to be a loan from inception and CFG's conduct and the documents plainly demonstrate that CFG is not actually purchasing receivables or future receipts but using this false construct to hide an unlawful loan transaction.  Indeed, JP's Inn is a restaurant which serves food and beverages in exchange for the simultaneous collection of cash or cash equivalent (a credit card payment) and, thus, there never were any 'account receivables' or 'future receivables' to be purchased by CFG.  Since there are no receivables, there could be no purchase and sale of receivables and the transactions between JP's Inn and CFG were nothing other than loans with criminally usurious interest rates.  It is undisputable that there was never any transfer of risk of non-collection of the receivables, a hallmark of a true sale of receivables.

### THE PARTIES

5.      Plaintiff, JP'S INN, INC. is a New York corporation which operates a restaurant in Bronx County, New York.

6.      Plaintiff, JOHN PIRRAGLIA resides in, and is a citizen of, the State of New York.

7.      Defendant, CFG MERCHANT SOLUTIONS, LLC ("CFG"), is a Delaware limited liability company with its principal place of business located in Wilmington, New Castle County, Delaware.

8.      The John/Jane Doe Defendants are the various officers and owners of each CFG, as well as the investors in CFG, who participated in this illegal scheme and whose identities will

be sought during the course of discovery in this case.

**JURISDICTION AND VENUE**

9.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

11.     Each Defendant is subject to the personal jurisdiction of this Court because CFG has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

12.     The written agreements between Plaintiffs and CFG provides that venue is proper in the State of New York.

13.     All conditions precedent to the bringing of this action have occurred, been performed or have been otherwise waived.

**GENERAL ALLEGATIONS**

14.     JP's Inn is a five-star seafood restaurant located in City Island, New York and is owned and controlled by the individual Plaintiff, John Pirraglia.

15.     Like many other small businesses, JP's Inn suffered financially in recent years, especially during the heart of the pandemic.

16.     While JP's Inn had previously relied primarily on traditional lenders, it recently fell victim to a group of funders who provide that provide payday loans for business called merchant cash advances.

17.     These types of lenders, like CFG, loan money to merchants, like JP's Inn, under the guise of a merchant cash advance, which they describe as a 'purchase and sale of future receivables.' As a general matter, an issuer of a merchant cash advance provides a merchant with

a lump sum payment in exchange for a fixed share of the merchant's future sales income/receipts, or "receivables," up to a certain total repayment amount.

18.     As a result, unlike a loan, a true merchant cash advance does not guarantee an issuer a regular payment or a fixed, finite term.  Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables.  Because payment amounts vary, the lengths of repayment terms also vary.

19.     This variability and lack of security create certain risks for funders but also creates certain protections for merchants by being able to reduce required payments when business is slow.

20.     In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term.  In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

21.     The Defendants herein attempt to style their transactions as a 'purchases of future receivables' in order to evade New York's 16% interest rate cap and the other legal protections and requirements that exist for loans.  But in fact, CFG's transactions function as loans, and, as a result, Plaintiffs are entitled to the protections afforded to borrowers under New York law.

22.     The title to the CFG agreements is a sham.  In form, substance and in every conceivable way, CFG's agreements function as absolutely repayable loans with interest rates of approximately 90% per annum.

23.     CFG also markets and collects upon the cash advances as loans. CFG requires the recipient of the funding (here, JP's Inn) to repay the loans through fixed daily payments, which

are debited from the JP's Inn's bank accounts at set amounts ranging here from $2,000.00 to $2,979 per day. CFG requires the loans to be repaid in short terms (approximately 180 days), at annual interest rates well above the 16% threshold that defines usury under New York law. In fact, the annual interest rates charged by CFG here is over five times this limit.

24. Unlike a true purchase of future receivables, CFG does not set the daily payment amount as an actual, reality-based, percentage of JP's Inn's daily receipts, but it sets the daily payment amount solely upon the term/length of the loan within which CFG wants to be repaid.

25. In other words, while CFG had access, prior to preparing their form contract and prior to the funding, to all of the necessary financial records including the bank statements of JP's Inn, CFG never actually tailored the daily payment amount to JP's Inn's actual receipts. Rather, CFG pretended to do so in order to circumvent laws designed to protect companies like JP's Inn.

26. Each of CFG's agreements contain the following:

   a. The amount of future receivables that CFG was allegedly purchasing (i.e, on the most recent agreement, CFG was allegedly purchasing $536,200.00 of JP's Inn's future receivables);

   b. The percentage of future receivables allegedly being purchased (i.e., on the most recent agreement, CFG allegedly purchased 14.72% of JP's Inn's future receivables);

   c. The amount CFG was to pay to the company for the future receivables (i.e., on the most recent agreement, CFG agreed to pay $383,000.00);[1] and

---

[1] In every case, CFG never actually funded the amount set forth in the agreement. There were always deductions before the alleged purchase price was wire transferred to JP's Inn for items such as underwriting fees, origination fees, ACH set-up fees, due diligence fees, etc. Taking the example of the most recent agreement, while the purchase price was set at $383,000.00, only $377,255.00 was actually funded. A classic bait and switch.

d. The daily amount to be removed via ACH from the bank account of JP's Inn (i.e., on the most recent agreement, CFG was to debit JP' Inn's account in the amount of $2,979.00 per day, which would mean the amount would be repaid in 180 daily payments, or roughly a 9 month term).

### A. **Specifics About the Merchant Cash Advances Issued by CFG**

27. CFG issued two merchant cash advances to JP's Inn. First, on July 20, 2023, CFG loaned JP's Inn the sum of $265,000.00. CFG only funded $259,700.00 attributing the balance to things such as a "facility fee", an "original fee" an ACH Program Fee", a "Risk Assessment Fee", etc. See Exhibit A.

28. In exchange, JP's Inn was required to re-pay the sum of $376,300.00 over 188 daily payments (roughly a 9 month term). See Exhibit A.

29. CFG required that JP's Inn sign an authorization so that it would be paid via automatic deductions from JP's Inn's bank account in the sum of $2,000.00 each weekday. See Exhibit A.

30. If annualized, the rate of interest on the money provided by CFG is approximately 91% per annum (or 97% if you take into account the fees charged).

31. According to CFG's agreement, it pretended to be purchasing 12% of JP's Inn's future receivables.

32. CFG also required a personal guaranty from Mr. Pirraglia.

33. Then, before the first agreement was fully paid, CFG offered JP's Inn what it calls a 'renewal'. Here, CFG offers to provide new funding but a portion of the new funding pays off the existing balance. When this happens, the term of the first loan is shortened and, thus, the effective interest rate is even higher.

34.     Specifically, CFG issued its second round of funding to JP's Inn on November 14, 2023 when it loaned JP's Inn the sum of $383,000.  See Exhibit B.

35.     However, of this $383,000, CFG paid itself back $277,900 of the balance of the July 21, 2023 agreement.  Thus, JP's Inn only received approximately $105,000 of new money.

36.     Moreover, by paying itself back on the full amount of the July 21, 2023 agreement on November 14, 2023, CFG's effective interest rate on the July 21, 2023 became 188% per annum.

37.     CFG also did not even fund the full amount of the November 14, 2023 agreement. Rather, it also charged various junk fees like a "facility fee", an "original fee" an ACH Program Fee", a "Risk Assessment Fee", etc. and only funded $377,255 (the bulk of which repaid its own balance on the first agreement)  See Exhibit B.

38.     In exchange, for this additional funding, JP's Inn was required to re-pay the sum of $536,200.00 over 180 daily payments (roughly a 9 month term).  See Exhibit B.

39.     CFG required that JP's Inn sign an authorization so that it would be paid via automatic deductions from JP's Inn's bank account in the sum of $2,979.00 each weekday.  See Exhibit B.

40.     If annualized, the rate of interest on the money provided by CFG is approximately 88% per annum (or 92% if you take into account the fees charged).

41.     According to CFG's agreement, it pretended to be purchasing 14.72% of JP's Inn's future receivables.

42.     CFG also required a personal guaranty from Mr. Pirraglia.

**The MCA Agreements Are Substantively and Procedurally Unconscionable**

43.     Each of the CFG "Purchase Agreements" described above (the "MCA Agreements") are unconscionable contracts of adhesion that are not negotiated at arms-length.

44.    Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners (like the Plaintiffs herein) and help conceal the fact that the transactions (collectively the "Transactions"), including those involving JP's Inn, are really loans.

45.    Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from JP's Inn's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing JP's Inn from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating JP's Inn to pay the MCA company's attorneys' fees but not the other way around, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of JP's Inn's assets, (9) a prohibition of obtaining financing from other sources, (10) the maintenance of business interruption insurance, (11) the right to direct all credit card processing payments to the MCA company, (12) a power-of-attorney to take any and all action necessary to direct such new or additional credit card processor to make payment to [the Enterprise], and (13) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

46.    The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that JP's Inn's business suffers any downturn in sales by (1) forcing JP's Inn to wait until a specified day of each month before entitling it to invoke the reconciliation provision, (2) preventing JP's Inn from obtaining other financing, (3) and requiring JP's Inn to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

47.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.   Among these improper penalties, the MCA Agreements (1) accelerate the entire debt upon an Event of Default, and (2) require the merchant to turn over 100% of all of its credit card sales if it misses just a few fixed daily payments.

**A.     The MCA Agreements Each Uses a Sham**
**Reconciliation Provision to Disguise the Loans.**

48.     In order to evade New York usury laws, CFG includes a sham reconciliation provision in the MCA Agreements to give the appearance that the loans do not have a definite term.

49.     Under a legitimate reconciliation provision, if JP's Inn pays more through its fixed daily payments than it actually received in receivables, JP's Inn is entitled to seek the repayment of any excess money paid.   Thus, if sales decrease, so do the payments.

50.     For example, if CFG purchased 25% of JP's Inn's receivables, and JP's Inn generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.   Thus, if JP's Inn paid $40,000 through its daily payments, then JP's Inn is entitled to $15,000 back under the sham reconciliation provision.

51.     In order to ensure that JP's Inn can never use their sham reconciliation provision, however, CFG falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.   By doing so, CFG ensures that if sales decrease, the required fixed daily payments remain the same.

52.     For example, if 25% of JP's Inn's actual monthly receivables would result in a daily payment of $1,000, MCA-Funder Defendant falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, JP's Inn would not be able to invoke the reconciliation provision.

53.     On information and belief, CFG does not actually have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

54.     In fact, each of the MCA Agreements specifically requires CFG to affirmatively reconcile the accounts each month but it never does.

**B.     The Defendants Intentionally Disguised the True Nature of the Transactions**.

55.     Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the Plaintiffs absolutely liable for repayment of the purchased amount.  The loans sought to obligate JP's Inn to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, JP's Inn was in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)     While the MCA Agreements purported to "assign" all of the JP's Inn's future account receivables to CFG until the purchased amount was paid, JP's Inn retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, CFG merely acquired a security interest in the JP's Inn's accounts to secure payment of the purchased amount;

(d)    JP's Inn is a restaurant which has no account receivables to sell and its sales are for immediate cash or credit card payments, none of JP's Inn's customers are invoiced for their meals to be paid later;

(e)    Unlike true receivable purchase transactions, the Transactions were underwritten based upon an assessment of each of JP's Inn's credit worthiness; not the creditworthiness of any imaginary account debtor;

(f)    The purchased amount was not calculated based upon the fair market value of JP's Inn's future receivables, but rather was unilaterally dictated by CFG based upon the interest rate it wanted to be paid.    Indeed, as part of the underwriting process, CFG never requested any information concerning JP's Inn's imaginary account debtors (because there were none) upon which to make a fair market determination of their value;

(g)    The amount of the daily payments was determined based upon when CFG wanted to be paid, and not based upon any good-faith estimate of JP's Inn's future account receivables;

(h)    CFG never assumed a risk of loss due to JP's Inn's failure to generate sufficient receivables because the failure to maintain sufficient funds in JP's Inn's bank account constituted a default under the agreements;

(i)    CFG required that JP's Inn undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate daily income and a breach of such obligations, representations and warranties constituted a default, which fully protected CFG from any risk of loss resulting from JP's Inn's failure to generate daily income; and.

(j)      CFG required that JP's Inn grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which CFG knew was breached from day one.

56.      CFG also shows in its underwriting practices that their agreements are loans. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  Here, CFG knew that it was issuing funding to a restaurant with zero account receivables.  Thus, its entire focus was on JP's Inn's bank statements, income and its own credit worthiness (not the credit worthiness of JP's Inn's customers).

57.      When CFG collects upon their agreements, it treats them just like loans.  For example, CFG requires that JP's Inn enter into an MCA Agreement make fixed daily payments and grant security interests in all of its credit card receipts and CFG states that it is entitled to 100% of the credit card receipts so that its full loan can be repaid immediately if just a few daily payments are missed.

58.      In other words, CFG structures its transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

59.      JP's Inn fell victim to all of these predatory tactics.

**C.      None of the MCA Agreements Was a True Sale of Future Receivables**.

60.      Notwithstanding their titles, the MCA Agreements were not the sale/purchase of receivables.  Plain and simple, there were loans.

61.      The MCA Agreements have none of indicia of a true sale and all the indicia of a loan.  Among other things: (i) each of the MCA Agreements failed to transfer the risk and benefits of ownership of the future receivables from JP's Inn to CFG; (ii) there were no future receivables to be sold since JP's Inn is a restaurant that is paid by its customers immediately and

not on some date in the future; (iii) JP's Inn remained absolutely liable for repayment of the full 'purchased amounts'; (iv) CFG had full recourse rights against JP's Inn and its principal, Mr. Pirraglia; (v) the daily payments amounts were fixed and required payment within the specific time period chosen by CFG; and (vi) CFG's reconciliation provisions is a sham.

**D.** **The Terms of Each of the MCA Agreement Fail to Transfer the Risks and Benefits of Ownership of Future Receivables from JP's Inn to CFG.**

62.     The *sine qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfers from the seller to the buyer. That did not occur in connection with any of the MCA Agreements or Transactions here.

63.     Here, JP's Inn was responsible for generating and collecting its daily receipts, it exercised complete dominion and control over the future receipts and it retained the risk of the inability to create its future income. In other words, notwithstanding the sale and assignment language of the MCA Agreements, all of the benefits and risks of ownership of the future income remained with JP's Inn.

64.     Pursuant to the each of the MCA Agreements, the pretend seller (JP's Inn) was responsible for generating sufficient daily income and depositing a "Specified Percentage" of each transaction into a designated account so that CFG could debit the daily payments.

65.     So long as it made the daily payments, the pretend seller (here, JP's Inn) was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased future receipt, in its daily operations.

66.     Indeed, the excess proceeds were supposedly JP's Inn's only source of operating capital because each of the MCA Agreements specifically prohibited JP's Inn from further encumbering the future income. Thus, JP's Inn had to use the proceeds of the allegedly purchased future receipts in order to operate its business.

67.     JP's Inn's complete dominion and control over the future receipts and its right to use the proceeds of the alleged purchased future receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the MCA Agreements were a true sale.

68.     Similarly, JP's Inn retained the risk of loss associated with non-payment of the future receipts.  Among other things, if a particular future receipt was not collectible, there was no reduction in the purchased amount and CFG would be repaid from the next collected future receipt or the proceeds of any other sale transaction.

**E.      JP's Inn Remained Absolutely Liable
for Repayment of the Purchased Amount**

69.     By operation of the default rights and remedies under the MCA Agreements, repayment of the purchased amount was put beyond any risk of non-payment and JP's Inn remained absolutely liable for repayment of the purportedly purchased amounts.

70.     Under each of the MCA Agreements, if an event of default occurred, JP's Inn, as the pretend sellers of the future receipts, immediately became liable for the full outstanding purchased amounts, together with additional fees and costs due under the MCA Agreements.

71.     An event of default is defined under the MCA Agreements so that a default would occur under any and every conceivable circumstance wherein the pretend seller (JP's Inn) failed to generate or collect future income to repay CFG.

72.     Most importantly, the failure of JP's Inn (the pretend seller of the future receipts) to generate and collect sufficient revenue to make the daily payments would automatically constitute an Event of Default under each of the MCA Agreements after just a few days of having insufficient funds ("NSF") in the account which is set up for automatically daily ACH debits.

73.     It would also be an Event of Default under each of the MCA Agreements if the JP's Inn/the pretend seller of the future receipts: (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if JP's Inn's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the MCA Agreements and, pursuant to the remedies provided by such Agreement, each Plaintiff would be immediately liable for the full outstanding balance of purchased amount, plus all fees and costs due under the MCA Agreement.

**F.     CFG Retained Full Recourse Rights**

74.     In order to further ensure its performance under each of the MCA Agreements, JP's Inn granted each MCA-Funder Defendant a security interest in substantially all of its assets including all of its all accounts and credit card receipts, not just that small percentage that was allegedly sold to CFG (the "Collateral").

75.     Upon an Event of Default, CFG was entitled to exercise all of their rights and remedies under the UCC.

76.     Thus, if JP's Inn/the pretend seller of the future receipts missed as few daily payments, for any reason whatsoever, CFG could foreclose on the Collateral and receive 100% of the income until CFG was fully paid.

77.     Such recourse provisions are not indicative of a true sale, but rather, a loan.

**G.     The Daily Payments Were Fixed
and Resulted in a Usurious Interest Rate**

78.     There can be no question that the daily payments under each of the MCA Agreements were fixed.

79.     Under each of the MCA Agreements, JP's Inn/the pretend seller of the future receipts was obligated to repay the Purchased Amount by remitting a concocted 'specified

percentage' of its 'daily receipts' into a specific designated account (the "Designated Account") and CFG would debit the daily payment from the Designated Account.

80.     While the daily payments were supposed to equal a specified percentage of JP's Inn/the pretend seller's daily receipts, in reality, the daily payments reflected nothing more than how quickly CFG wanted to get paid.

81.     This is true despite the fact that CFG was given viewing access to JP's Inn/the pretend seller's bank accounts "in order to calculate the amount of such payments."  In other words, CFG undertook to calculate, on daily basis, what the fixed percentage of JP's Inn/the pretend seller's daily receipts would be and, on or about a certain day of every month, CFG was supposed to reconcile their collections with the JP's Inn/the pretend seller's actual receipts to ensure that they never collected more than that fixed percentage of the receipts on a monthly basis.

82.     However, despite being given viewing access to the JP's Inn/the pretend seller's bank accounts for the express purpose of reconciling them, CFG never actually performed any reconciliation of JP's Inn/the pretend seller's account nor did they ever intend to do so because the daily payments were not an actual estimate of the fixed percentage of JP's Inn/the pretend seller's daily receipts but rather, they were simply a reflection of how quickly the MCA-Funder Defendant wanted to be repaid.

**H.      JP's Inn and its Businesses, Finances, and Credit
          Have Been Demolished as a Result of Defendants' Conduct**

83.     CFG inflicted immense financial and personal harm upon Plaintiffs who they purport to help.  CFG pressured Plaintiffs into deceptive and lopsided agreements, loan money to JP's Inn at nearly triple-digit interest rates, wrongly seize large sums from JP's Inn's bank accounts, which then resulted in JP's Inn having to look to other similar merchant cash advance lenders which resulted in the spiral of unending debt we see here.

84.     CFG is responsible for the usurious, fraudulent, and illegal conduct set forth herein.

## FIRST CAUSE OF ACTION
## (RICO:  18 U.S.C. § 1962)

85.     Plaintiffs adopt and reallege paragraphs 1 through 84 as if fully set forth herein.

**A.     The Unlawful Activity.**

86.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

87.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

88.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

89.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

90.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

91.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

92.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

93.     Like here, this was a purely artificial device used by the loanshark to evade the law - an evasion that the Legislature sought to prevent.

94.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

95.     CFG, as well as the various officers and owners of CFG, and the investors in CFG, who participated in this illegal scheme (and whose identities will be sought during the course of discovery in this case) are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

96.     At all relevant times, each of the various officers, owners, and investors of CFG (the "RICO Persons") was, and is, a person that exists separate and distinct from the MCA-Funder Defendant itself.

97.     The officers of CFG, who will be identified through discovery, manage and direct CFG and knowingly participated in the enterprise and the fraudulent scheme described above.

98.     The owners of CFG, who will be identified through discovery, have an ownership interest in CFG and knowingly participated in the enterprise and the fraudulent scheme described above.

99.     The investors of CFG, who will be identified through discovery, invest capital into CFG and receive a significant return on his/her/its investment, and knowingly participated in the enterprise and the fraudulent scheme described above.

100.     Through their operation of CFG, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in New York (which has usury laws) and other states that do not have usury laws.

**C.     The Enterprise**

101.     CFG, together with its respective as officers, owners and investors, constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (each, an "Enterprise").

102.     CFG, together with its respective as officers, owners, and investors, are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

103.     The members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

104.     The debt, including such debt evidenced by the MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

105.     CFG and the various other members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

106.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and

continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

### D. The Roles of the RICO Persons in Operating the Enterprise, and the Roles of CFG within the Enterprise.

107. The RICO Persons of each Enterprise have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

The Owners and Officers

108. The John/Jane Doe Defendants who are the owners and officers are the masterminds of each Enterprise. They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

109. In such capacity, the John/Jane Doe Defendants who are the owners and officers of each Enterprise are responsible for creating, approving and implementing the policies, practices and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Plaintiffs here.

110. The John/Jane Doe Defendants who are the owners and officers of each Enterprise also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

111. The John/Jane Doe Defendants who are the owners and officers of each Enterprise have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the owners and investors.

CFG Itself

112. CFG is a limited liability company organized under the laws of the state of Delaware. CFG maintains officers, books, records, and bank accounts independent of the John/Jane Doe Defendants who are the owners, officers and investors of each Enterprise.

113. CFG is operated as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to his/her/its membership in an Enterprise, the John/Jane Doe Defendants who are the owners and officers of each Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John/Jane Doe Investor Defendants to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

114. In this case, the John/Jane Doe Defendants who are the owners and officers of CFG and the John/Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the MCA Agreements; (iii) underwrote the MCA Agreements; (iv) entered into the MCA

Agreements; and (v) collected upon the unlawful debt evidenced by the MCA Agreements by effecting daily ACH withdrawals from the bank accounts of one or more of the Plaintiffs.

The John/Jane Doe Investors

115. The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of CFG.

116. Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing CFG with all or a portion of the pooled funds necessary to fund the usurious loans, including the MCA Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

117. The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

**E.     Interstate Commerce**

118. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

119. Specifically, members of each Enterprise maintain offices in either New York, Delaware and/or Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to JP's Inn in New York, and throughout the United States, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

120. In the present case, much of the communications between the members of each Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate

wire communications. Specifically, each Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the daily payments via interstate electronic ACH debits.

F. **Injury and Causation.**

121. Each Plaintiff has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

122. The injuries to each Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

123. Each Plaintiffs has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

124. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(CONSPIRACY UNDER 18 U.S.C. § 1962(d))**

125. Plaintiffs adopt and reallege paragraphs 1 through 124 as if fully set forth herein.

126. Each Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of his/her/its Enterprise, to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

127. By and through each of the Defendants' business relationships with the other members of his/her/its Enterprise, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among such Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the

Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants in his/her/its Enterprise were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

128. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of an Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in one or more of the Enterprises and its affairs, and each of the

129. The Defendants who participated in the Enterprise shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements within that Enterprise.

130. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of such Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

131. The participation and agreement of each of Defendant in the Enterprise was necessary to allow the commission of this scheme.

132. Each Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

133. The injuries to each Plaintiff are directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

134.    Each Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

135.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
## (BREACH OF CONTRACT)

136.    Plaintiffs adopt and reallege paragraphs 1 through 84 as if fully set forth herein.

137.    Assuming a valid contract existed, CFG breached the respective and applicable MCA Agreement by:

    a.  Refusing to reconcile the daily payments and have such payments be a true reflection of the daily receipts based on the amount of receivables allegedly purchased; and

    b.  Not funding the amount required under the respective agreement.

138.    JP's Inn suffered damages as a direct and proximate result of CFG's breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and seek an Order:

a)    Declaring each of the MCA Agreements to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)    Awarding treble damages;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.

Dated this 19th day of December, 2023.

Respectfully submitted,


 _/s/  John M. Stravato_
**JOHN M. STRAVATO, ESQ.**
5 Bagatelle Road
Dix Hills, New York  11746
Email:      johnmstravato@gmail.com
Telephone:    (516) 633-2639
*Trial Counsel for Plaintiffs*